PERE MARQUETTE RAILROAD CO. *v.* WABASH RAILROAD CO.

1. CHANCERY APPEAL—JURISDICTION—EQUITABLE CONTROVERSY— QUESTION RAISED BELOW.

A bill as filed contained a prayer for a temporary injunction to restrain defendant's interference with complainant's rights under contracts of which construction was sought by the bill, but by agreement between the parties the injunction was rendered unnecessary and the cause was litigated on the merits by all parties. *Held*, that an objection by defendant, on appeal, that the bill was filed solely to obtain construction of a contract, and was not within any recognized branch of equity jurisdiction, and for that reason should be dismissed, would not be considered.

2. RAILROADS — TERMINALS — JOINT OCCUPANCY — LEASES — CONSTRUCTION.

The rights of a railroad company under its lease of terminal facilities from a union station company cannot be measured or affected by a subsequent lease by the station company to another railroad company.

3. SAME—LEASE—CONSTRUCTION.

> The rule that where a lease is susceptible of two constructions, that most favorable to the lessee must prevail, cannot be invoked where the intention of the parties can be determined from the language of the instrument when examined in the light of the surrounding conditions and circumstances.

4. SAME—TERMINALS—LEASE—CONSTRUCTION.

> Certain leases and terminal agreements between a union station company and several railroads examined, and *held*, that certain reservations in the lease of the railroad company first to avail itself of the facilities offered by the station company, were made for the benefit of the station company through leasing rights to other railroads; that the railroad companies were tenants in common of a certain ferry slip contemplated but not built until after execution of the lease; that such first company had not title under its lease to land and tracks constituting a connecting railroad; and that rights recognized by the terminal agreement were not merely created for the life of that agreement, but existed in perpetuity.

Appeal from Wayne; Brooke, J. Submitted May 4, 1905. (Docket No. 137.) Decided September 19, 1905.

Bill by the Pere Marquette Railroad Company against the Wabash Railroad Company and the Detroit Union Railroad Depot & Station Company to determine the rights of complainant in certain contracts and leases. From a decree for complainant, defendant Wabash Railroad Company appeals. Modified and affirmed.

*Frederick W. Stevens* (*Benton Hanchett*, of counsel), for complainant.

*Alexander L. Smith* and *C. N. Travous* (*Wells H. Blodgett* and *Alfred Russell*, of counsel), for defendant Wabash Railroad Co.

*Angell, Boynton, McMillan & Bodman*, for defendant Detroit Union Railroad Depot & Station Co.

HOOKER, J. The controversy in this cause is over the rights of the complainant in and to the use of certain

railroad property in the city of Detroit as against the claims of the Wabash Railroad Company. Both companies' rights, whatever they are, rest upon leases from the Detroit Union Railroad Depot & Station Company, except as such rights have been modified by agreements between themselves. These companies use the station of the Detroit Union Railroad Depot & Station Company, which they approach over tracks upon its property, and there are terminal facilities which both claim a right to use. The Wabash Company denies the claims of the complainant, if it does not impede the complainant in its use of such facilities. It is stated that, when the bill was filed, the Wabash Company had threatened to obstruct complainant's free use of the property, and that the bill as originally filed contained a prayer for a temporary injunction, but that an arrangement was made between the parties for the joint use of the property during the litigation, which made its issue unnecessary.

Counsel for the Wabash Railroad now urge that the bill is filed for the sole purpose of obtaining a construction of the contracts of the parties, and is not within any recognized branch of equity jurisdiction, and ask that the bill be dismissed upon that ground. The point is not raised by demurrer, but after full hearing upon the merits, and we do not discover that the point was made in the trial court.

The contracts involved are four: A lease to the Wabash, St. Louis & Pacific Railroad Company, to whose rights the defendant Wabash Railroad Company succeeded; a lease to the Flint & Pere Marquette Railroad Company and the Detroit, Lansing & Northern Railroad Company, joint lessees; a supplemental lease to the Wabash, St. Louis & Pacific Company; and a contract between the three railroad companies mentioned, called the "Terminal Agreement." The leases were made, in the order above stated, by the Detroit Union Railroad Depot & Station Company, a corporation organized under a statute permitting the incorporation of union depot and station

companies, designed to facilitate the entry of railroads into cities. See 2 Comp. Laws, § 6356 et seq. The object is stated in said section as follows:

" For the purpose of acquiring the necessary station grounds and constructing and maintaining railway freight and passenger depots in cities and villages, with the necessary railroad tracks and other accommodations to make suitable and proper connections with all railroads terminating in or passing through such cities or villages that may desire access to such depot; and also all necessary buildings for the convenience and accommodation of all business usually pertaining to such depots."

Section 28 of the act provides:

" All companies formed under this act shall, for a reasonable compensation, provide suitable depot accommodations for the passengers and freight of the railroads terminating or connecting with it, or desiring access thereto, and shall provide suitable tracks therefor, without discrimination in favor of or against any of such roads."

The object is stated in the articles of association thus:

"For the purpose of acquiring the necessary station grounds, and constructing and maintaining railway, freight, and passenger depots in the city of Detroit, county of Wayne, and State of Michigan, with the necessary railroad tracks and other accommodations to make suitable and proper connections with all railroads terminating or doing business in or passing through said city that may desire access to such depots, and for the purpose of constructing all necessary buildings for the convenience and accommodation of all business usually pertaining to such depots, and for the purpose of operating business upon such railroad tracks."

They also show a purpose to build a connecting railway—

" To or near the point where the Detroit, Butler & St. Louis Railroad right of way touches the right of way owned or operated by the Lake Shore & Michigan Southern Railroad Company, and to a connection with the track of the said Detroit, Butler & St. Louis Railroad at or near that point."

The Detroit, Butler & St. Louis Railroad is the railroad over which the Wabash has always reached the city of Detroit. Also an intention to construct tracks "to a point of junction with the Detroit, Lansing & Northern Railroad," and "for the purpose of securing a convenient access for the Detroit, Lansing & Northern Railroad Company * * * to and into said depot grounds in the city of Detroit." The company last named is one of the predecessors of the Pere Marquette.

The first lease was made in October, 1881, and at this time no terminal had been constructed. There was no ferry slip, wharf, elevator, or station. There were no tracks in the yard, and the four miles of railway, mentioned in the record as "the connecting railway," were yet to be built. The station company owned a piece of land bounded north by Woodbridge street, south by the Detroit river, and extending approximately from Twelfth to Eighteenth streets. Broadly stated, the object of the lease of October, 1881, was to provide terminal facilities for the Wabash road, including access to the Detroit river for wharfage and ferriage, and connection between the terminal and Wabash road four miles distant; also access to an elevator which the station company proposed to construct and operate. The next agreement affecting the premises was the lease to the Flint & Pere Marquette and Detroit, Lansing & Northern Railroads, to whose rights the complainant has succeeded. It is claimed, and must be admitted, that the complainant's lease was ineffective to convey greater rights than the station company had left after making its lease to the Wabash Company. A reference to the annexed map will facilitate an understanding of this lease.

The entire parcel represents the ground owned by the station company, when it made the lease to the Wabash Company. It does not include the four miles of connecting railway, nor does it include the land upon which it built the Third Street passenger station and the immediate approaches thereto. The Wabash instrument contains a

lease of the southerly portion of the land shown on the map, comprising the parcels, "o," "x," and "y," and the ferry slip, "a," not then constructed. The reservations that follow and limit the lease are:

1. A *tract of land* 400 feet long and 100 feet wide. This is the elevator parcel marked "o."

2. A space for a double track to and from the elevator, about as indicated on the map.

3. Land for a single track around the elevator for the return of cars.

4. "From the west end of the easterly 1,000 feet of the wharf, which shall be for the exclusive use of the party of the second part [i. e., the Wabash Company], westward to the proposed slip [Grand Trunk] for ferryboats, or to a point about 500 feet from the westerly boundary line of the tract."

5. "The wharf, to the width of 60 feet from the river front back, shall also be reserved, so far that all companies using the depot and station grounds shall have the right to use the same in common * * * in the course of their business" with each other and the Wabash Company.

6. Space necessary for certain tracks specified, to approach the wharf and other purposes, for common use.

7. "The common right to use the tracks to the ferry slip * * * is also reserved."

8. If neither of roads, Detroit, Lansing & Northern and Flint & Pere Marquette, obtain rights of the station company, it (the station company) to have the right to use as its own two-thirds of the (west) thousand feet of wharf reserved for joint use of all companies which may use the station grounds, and if only one of said companies does so to the extent of one-third, and shall have the right to grant such use, by way of lease or otherwise, to third parties or other railroads; access thereto being provided for.

Before referring to other provisions of the Wabash lease, we will examine complainant's lease as regards these premises. It leases to the complainant all of tract "xx," the same being separated for nearly its whole length from the Wabash parcel by the strip "z," 65 feet wide. It quotes the reservation in the Wabash lease and gives the right to a common use of all the tracks, wharves, etc.,

provided for in the reservation in the first lease, and expressly grants "all such rights as have not been granted to the Wabash, St. Louis & Pacific Railroad, and for all purposes therein stated; it being understood that all tracks and rights of way hereby granted and leased are for the *joint* use of the *parties hereto* and the said *Wabash, St. Louis & Pacific Railroad Company.*"

We will next examine these two leases with reference to the four-mile right of way upon which the connecting railway is built. That is a tract of land 60 feet wide, and furnishes access for both roads to the terminal yard and station. The Wabash lease contains an agreement on the part of the station company to obtain a right of way wide enough for four tracks in fee simple, and to lease the same to the Wabash, subject to the reservation herein made, and to build upon said right of way a track or tracks, single or double, as the Wabash Company should desire, from its railroad to the station grounds.

"This right of way is leased with this understanding and reservation: That in case other parties shall desire to use the station grounds, and the station company shall build a track, single or double, for them, on said right of way, or to connect with said tracks for joint and common use of them on said right of way, it shall have the right to do so."

The lease to the complainant's predecessors grants to them jointly one-half of the right of way 60 feet wide, together with the right to use jointly with the Wabash that part crossing certain railroads mentioned. It then contains this provision:

"The said right of way and rights in this clause described shall be used in common; the one-half part by the parties of the second and third parts hereto, and the one-half part thereof by the said Wabash, St. Louis & Pacific Railroad Company or its successors."

We have referred to the provisions of the two leases, that the claims of the respective parties may be the better understood. The tracks, buildings, etc., have been built

as contemplated by the parties, and two ferry slips are in use; one where shown on the map, and the other is near to it, though it is but partially, if at all, upon the land included in the first lease. Both were constructed by the station company. It also appears that many spur tracks, leading from the tracks upon the 60-foot right of way, called the "connecting road," to manufacturing and other plants along its line on both sides, have been built. There are two main tracks upon the connecting road, extending from Delray to Seventeenth street. The Pere Marquette claims that the two main tracks and the spurs and sidings built prior to 1894, except one, are owned in common by the two railroad companies, subject to the station company's rights, and that said two companies have a common interest in the right of way of the connecting railway. It also claims the right to the joint use of the slips. The Wabash denies these claims.

We pass by the technical point made over the question of jurisdiction. Had it been made by demurrer, as it might have been, we should hesitate before overruling it; but there is a genuine controversy here, which equity can best settle, and both parties have seen fit to litigate its merits. Moreover, while an injunction has not issued, its necessity is apparent, if complainant's claims are just, and, considering the opinion of the circuit judge, we feel warranted in saying that it would doubtless have been allowed, but for the temporary arrangement to avoid it, which has substantially the same effect. We think that we should not insist on the empty form of an amendment of the bill and the issue of a temporary injunction, or an allegation of threatened obstruction and a prayer for a permanent restraining order. It is apparent that the threatened obstruction is imminent and the latter a necessary relief, if complainant is right in its claim.

We have already said that the rights conveyed to the Wabash Company are not to be directly measured or affected by the subsequent lease to the complainant. Of itself it cannot lessen them. We will therefore discuss

the first lease with a view to ascertaining what rights the Wabash Company has under it, as against both defendants; for the rights of the station company are involved, and it is before the court, being in sympathy with the complainant's claims, and asking that the decree from which its codefendant has appealed be affirmed.

Counsel for the Wabash Company say that there is no ambiguity in the terms 'of this lease, and that, if it is susceptible of two constructions, the one most favorable to the lessee must prevail. We recognize that as a rule of construction within proper limits, but we think it should not be invoked, where the intention of the parties is determinable from the language used, when examined in the light of surrounding conditions and circumstances.

The Wabash Company was the first to avail itself of the opportunity afforded by the Union Station Company's project. By its lease it secured certain exclusive rights in depots, warehouses, the wharf, etc., and probably in some of the tracks laid upon the land which was unqualifiedly leased to it. On the other hand, it obtained merely a right to use other parts, such as the ground upon which the elevator and elevator tracks, and return tracks were laid; for such *land* was reserved in clear and unmistakable language. We are of the opinion that there was a clear reservation of the land or space for the ferry tracks, and that from the west end of the easterly 1,000 feet of the wharf, westward to the proposed ferry slip, also the wharf, and for such other tracks as should become necessary for its use, and for the connections of all companies which should acquire from the station company the right to use the depot and station grounds. This was more than a covenant on the part of the Wabash Company to permit other companies to use these things, and more than an attempted reservation by the station company to certain third parties. It was a reservation to the station company itself for its own benefit, through leasing rights to other railroad companies, which its organization con-

templated, and the lease plainly indicated its intention to do.

The lease in question required the station company to build certain structures, wharves, etc. Among these was the Grand Trunk ferry slip. That was not specifically mentioned in the reservation, but it was included in the plans agreed upon, and the station company constructed it. In our opinion it was one of the terminal facilities, which, like the wharf and depot, was understood to be for common use. The object of the station company's organization and its patronage by the Wabash and other roads may reasonably be said to have included facilities for Eastern connections and through traffic, east and west; and, as the right reserved to use the tracks to the slip would manifestly be confined to a use consistent with the use of the slip, preventing use for other purposes, it would be valueless, except in connection with the use of the slip. The contention of the Wabash Company that it must alone provide ferries and transport complainant's cars for compensation cannot prevail. There is nothing in the lease making such a limitation, and it might as well be claimed that it should control the approaches in a similar way. That would not be a "common use." With the question of inconvenience in the use of the slip we have nothing to do. The parties must, by agreement or otherwise, adjust their use of these facilities in some lawful way. Until they do, they have the rights of tenants in common.

At the time the first lease was made the station company contemplated building a passenger station upon a portion of its property, and it is clear that it expected that its codefendant and complainant's predecessors, as well as other roads, might have access to it over the whole or a portion of the four-mile connecting road which it expected to provide. It afterwards changed the location and built its depot at Third street, but has used the connecting road for access to it, and all trains have entered over it. As in the case of the station ground, the writing contains a

141 Mich.—15.

provision for leasing to the Wabash Company the entire right of way, and it would necessarily be so construed, but for the later provision that " the said right of way is leased with the understanding and reservation." Then follows the statement that the station company may provide tracks for other railroads desiring it, and the lease provides for an abatement of rent in favor of the Wabash Company upon the happening of such event. No one disputes that the lease to the complainant gives it the right to use the track built for it upon the north half of the right of way; but the Wabash Company contends that it conveys no title, but only a right to run its trains over the track, and this not exclusive, and that the title of the land and the track, including spur tracks, is in the Wabash Company by virtue of its lease. We are convinced, from the nature of the transaction and the relation of the parties, that it was not the meaning of the lease to convey the entire right of way to the exclusion of the station company, which undertook to reserve the right to use it for other railroads in accordance with the plan of its organization. The lease might have been more carefully drawn. Yet, when we consider all of its parts, it seems apparent that it was not the design that the Wabash Company should have possession and use it all. It was to have one or two tracks, and, while its rental was based on the cost of the entire right of way, that was to continue only until the time when the station company should make arrangement for the use of the remainder over and above the portion to be used by the Wabash Company. When this was done, the rent was lessened in proportion, in which the Wabash Company acquiesced, as well as in the user by the complainant road.

Indeed, this is a construction too favorable, perhaps, to the Wabash Company, as it implies an exclusive right to the southerly half of the right of way, while there may be some doubt if this was intended, and whether it was not the original design to make the connecting main tracks, at least, subject to common use. When we consider the

necessary expectation that spur tracks would be required to the lands of adjacent properties, both to the north and south of the connecting track, it is hardly reasonable to suppose that either the Wabash Company or subsequent lessees would be content to be excluded from the spurs on either side, or that the station company would intentionally make leases contemplating such a thing. We are by no means sure that it was not the design of the parties in the first lease to reserve to the station company for future lessees a common right over all tracks on the connecting right of way, and that it was accomplished by the following language:

"The said right of way is leased with this understanding and reservation: That in case other parties shall desire to use the station grounds of the said first party, and the first party shall build a track, single or double, for them on said right of way, or to connect with said tracks for joint and common use of them for their accommodation on any part of said right of way, it shall have the right to do so."

However that may be, we conclude that the Wabash Company cannot claim a superior title to the north half of said connecting line, or restrict the complainant's use of it under the original lease, except by its common right, if contemplated by the original lease.

We have now determined that the complainant cannot be denied the common use of the north half of the connecting road and of the Grand Trunk slip and tracks connecting with it, upon the theory that the original lease deprived the station company of the right to grant them. In 1889 the complainant's lease was made. It is inferable that some differences arose between the parties to this suit from a contract which was made between the station company and Wabash Company in 1890. This contract recites certain alleged facts, among which are:

1. That certain portions of the station grounds and railroad have been leased to complainant's predecessors.

2. A change in the place and situation for a passenger depot.

3. That some of the reserved rights in the *contract for a lease* were not stated with *perhaps* sufficient distinctness and clearness.

4. "For the joint use of said grounds by all of said companies it is expedient that there should be some revision of the said contract in some respects, and of the boundaries of the property held and to be held and occupied by the Wabash Railroad Company."

And it was then agreed that the station company should lease to the Wabash Company the 65-foot strip of the station grounds hereinbefore alluded to and marked "z" on the map, subject to the reservations in the previous contract, but modifying them somewhat. It was agreed that they might be changed, but with the distinct understanding that—

"Tracks to and from the elevator and slips shall be such as to accommodate the business of the elevator and railroads with it, and business, also, of all railroad companies to and from the slips, which may use the station grounds under the leases made to them, not intending hereby to change in any way the rights of the said second party under its lease of 1881, but to give it a little larger liberty in arranging tracks to carry out the purposes and objects of the same and the reservations therein made."

While this, perhaps, did not affect the complainant's rights, it is mentioned as showing the situation at that time, and indicating differences and perhaps disagreement in relation to the earlier leases.

Another instrument, which in our opinion has an important bearing upon this controversy, is the one called the "Terminal Agreement" between the three railroad companies. The object of this agreement was to provide for the joint use of the main tracks and spurs upon the connecting road, etc. It recited that the several tracts of land and railway leased to the several railroad companies were so situated and located as to make it necessary for some uniform and connected system of tracks, and that the use of the tracks, in connection with the business of

the several roads, was so intermingled, and the interest of each so closely related to the others, as to make it imperative that an agreement should be arrived at for the *improvement of the property* and the *transaction of business* thereon.   Therefore it was agreed that for the purpose of carrying out such agreement the three railroad companies should form themselves into an association to be known as the "Union Terminal Association," which should continue for the term of 10 years, and this was to have the *management of the business*.   It designated certain property as the "terminal yards," and the four-mile track and spurs as the "connecting railway."   Each party was to transact its own business in its own portion of the terminal yard, but the tracks of either party might be used by the other in the necessary interchange of business between the two parts of the yard.   It was agreed, further, that inasmuch as the Wabash Company had a main track on the southerly portion of the connecting railway, the other parties should lay one or more tracks on the northerly portion at their own expense, and that *thereafter, during the continuance of this lease,* said connecting railway and all spurs and sidings of the connecting railway should be owned and used jointly by the parties as a *double track railroad.*   The operation, renewals, and maintenance of the main track, spur tracks, and sidings of the connecting railway and the structures and tracks of the terminal yard were to be in charge of the officers of the Union Terminal Association.   Each party was to be at the expense of maintaining its own part of the terminal yard, except that part which was to be used in common.   This was to be shared, as was also that of the connecting railroad.   Regarding the connecting railway, the agreement provided that the value of the two main tracks and spurs and sidings on both sides of the main track should be appraised, and that the differences between the values of those owned by the respective parties should be ascertained and paid.   Provision was

made for additional spurs and tracks, and then followed the words: ·

"Said main track, spurs, and sidings shall thereafter be owned and used in common, and shall be maintained by the Union Terminal Association, as heretofore provided."

The complainant contends that, aside from any common right which it claims under its original lease, this provision gives it such right in perpetuity. The Wabash Company insists that it has no such effect, for the reason that all of the provisions of that instrument have reference and are limited to the period of 10 years. By the terms of that instrument the cost of the connecting railway and spurs to the parties was equalized. No provision for repayment, and each assuming its own after 10 years, was made. The agreement does not say that they shall own this property for the period of 10 years, but "thereafter." Again the agreement provides that the terminal association shall exist for 10 years—not that all provisions shall be for 10 years; and, while the latter would be a natural inference unless words inconsistent appeared, we think they do appear. The term "thereafter" is a broad term. It might, however, be said to refer to the period for which the parties were contracting. There is, however, another provision that is perhaps more definite. It is as follows:

"The said first party having one main track on the southerly part of the right of way of the connecting railway, said second and third parties shall lay one or more tracks on the northerly part of the said right of way at their own expense; and *thereafter, during the continuance of this lease,* said connecting railway and all spurs and sidings of said connecting railway shall be owned and used jointly by the parties hereto as a double-track railroad."

What lease is referred to? It may be said that it refers to the agreement of which it is a part, but that has no semblance of a lease. This writing refers to the leases under which these rights were acquired, and it is not an unreasonable interpretation to say that this provision has

reference to the lease made to the Wabash Company, or perhaps it might be said to have meant the leases to both companies, and that this agreement, which is executed with the due formality of a deed, having seals, was designed to recognize as existing, or, if not, to create, a common interest in the connecting railway, its sidings and spurs, and to make an arrangement for its management for a temporary period, leaving a more permanent one to depend on the experiences during such period. It is much more reasonable and probable to conclude that this agreement that proposes to provide for a permanent improvement of property of this character and magnitude was intended to refer to such leases, and to make the common interest perpetual, than to ascribe to its makers an intent to take such an important step for the short period of 10 years.

We are of the opinion that the use of the Canadian slip is not within the complainant's lease, although it was authorized and permitted to use it under the terminal agreement for 10 years. But 20 feet of it is built upon the land covered by the original leases, if, indeed, any of it is. The remainder was constructed by the station company for and at the expense of the Wabash Company, and the complainant strenuously maintained that the joint use of the Canadian slip was not provided for by the terminal agreement, though the Wabash Company claimed that it was. Complainant is required by the decree to account for rental value during the period of the " terminal agreement," from which we infer that it has not paid such rent.

Allusion has not been made in this already long opinion to correspondence and circumstances indicating the understanding of the parties as to their mutual rights under the original leases. There is much of a convincing character, some of which, we think, is competent evidence upon the question of interpretation, especially that contained in the successive drafts of the terminal agreement. While they would be inadmissible to vary the clear lan-

guage of the instrument, they negative certain inferences which are urged, indicating, not only what was under consideration, but the rejection of provisions better calculated to express certain meaning than that employed. Such testimony is admissible under many authorities, for which we refer to the briefs of counsel. Neither have we discussed the question of "practical construction by the parties," which, in connection with the doctrine of estoppel, has an important place in the law of contracts. We omit them for the reason that in our opinion the agreements themselves, when viewed in the light of the surrounding circumstances, furnish sufficient evidence of the intention of the parties.

It is therefore ordered that the decree of the circuit court in chancery be in all things affirmed, except in so far as it relates to the Canadian Pacific slip, as to which it will be reversed, and the relief asked denied. A decree will be entered here in conformity to this opinion. Having prevailed in part, the appellant is entitled to costs of this court.

MOORE, C. J., and CARPENTER, McALVAY, and BLAIR, JJ., concurred.